UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ANTOINETTE BUGGS,

        Plaintiff,

v.

FCA US, LLC, and
DONNA LANGFORD REED,

        Defendants.
_____/

Case No. 20-10218

Honorable Nancy G. Edmunds

**OPINION AND ORDER GRANTING DEFENDANT FCA US, LLC'S
MOTION FOR SUMMARY JUDGMENT [20]**

      This is an employment discrimination case in which Plaintiff Antoinette Buggs brings discrimination, retaliation, and failure to accommodate claims under the Americans with Disabilities Act ("ADA") and Michigan's Persons with Disabilities Civil Rights Act ("PWDCRA") against her former employer, FCA US, LLC ("Defendant").[1]  The matter is now before the Court on Defendant's motion for summary judgment.  (ECF No. 20.)  Plaintiff opposes the motion.  (ECF No. 23.)  Defendant has filed a reply.  (ECF No. 26.)  Pursuant to Eastern District of Michigan Local Rule 7.1(f)(2), Defendant's motion will be decided on the briefs and without oral argument.  For the reasons below, the Court GRANTS Defendant's motion for summary judgment.

**I.**     **Background**

      This case arises from Plaintiff's employment as an assembly worker with Defendant at the Jefferson North Assembly Plant ("JNAP") in Detroit.  (ECF No. 23-2,

---

[1] Plaintiff also initially named her former supervisor, Donna Langford Reed, as a defendant in this case.  But a stipulated order dismissing Reed from this action has since been entered by the Court.  (ECF No. 24.)

1

PageID.542.) Her employment was subject to a collective bargaining agreement and she was represented by the United Auto Workers Union. Plaintiff first started as a temporary, part-time employee in June 2015. In that role, she served as a replacement for employees who were absent. Plaintiff was primarily assigned to Team 41 on the door line, doing either a "panel secure" job that required her to use a hand drill to apply screws to secure the panel to the door or a door tester job that also required the use of a hand drill. (*Id.* at PageID.543-44.)

Plaintiff began experiencing pain in her hands near the end of July 2016. On July 27, 2016, Plaintiff submitted a note to the medical department stating she may have carpal tunnel syndrome and should be restricted from doing any gripping, drilling, and using hand tools until November 15, 2016. (ECF No. 23-3, PageID.590.) This was inputted into the computer system that tracks employees' work restrictions and informs supervisors of the restrictions. (ECF No. 23-2, PageID.549.) As a result of these restrictions, Plaintiff was unable to perform the functions of the panel secure job. Because there were no other positions available for her that would meet her restrictions, she was given a thirty-day leave. She later went to her doctor and was cleared to return to work and diagnosed with bilateral carpel tunnel syndrome. (ECF No. 23-5.)

After returning to work, Plaintiff informed Defendant that she was unable to perform any of the available assembly jobs due to her disability. (ECF No. 23-2, PageID.550.) Plaintiff was told that she could not return to work until she had surgery. While off work, Plaintiff submitted a request for intermittent FMLA leave in August 2016. (ECF No. 23-6.) Plaintiff sought leave for two to three episodes per month and one day per episode for symptoms related to a previous stroke. Defendant approved Plaintiff's leave request

for the period from June 10, 2016 until December 31, 2016 based on "a serious health condition that makes you unable to perform the essential functions of your job." (ECF No. 20-7.)  But she did not use leave during that time period.

Plaintiff had two surgeries, one on each hand, in October and December of 2016. She returned to work after her surgeries on January 30, 2017.  (ECF No. 23-7.)  Upon her return to work, Plaintiff presented with restrictions to her right hand but no work restrictions.  In June 2017, Plaintiff against requested intermittent FMLA leave.  Plaintiff's request was denied because she had not worked the requisite 1250 hours in the preceding twelve months.  (ECF No. 23-8.)  Plaintiff was taken off the panel secure job and moved to the rear door panel job in July.  Plaintiff testified that this position went against the restrictions to her right hand, and she ended up further injuring her hand doing the rear door panel job.  (ECF Nos. 23-2, PageID.553; 23-9.)  Defendant notes there were no restrictions on file during that time.  (ECF No. 20-11.)

Plaintiff was hired as a regular full-time employee as of March 5, 2018.  Donna Langford Reed, who Plaintiff alleges subjected her to discrimination and harassment, had just become Plaintiff's supervisor a few days earlier—on February 28, 2018.  (ECF No. 23-2, PageID.546.)  In a voluntary statement submitted to the union, Plaintiff stated that on March 10, 2018, Reed moved her from Team 41 to Team 38 to work in a window seal job that she could not do because of her carpal tunnel syndrome.  (ECF Nos. 23-2, PageID.558; 23-10.)  She testified that she informed Reed of this and went to the medical department and informed them as well.  She was provided with wrist wraps, biofreeze, and over-the-counter medication.  (ECF No. 23-11, PageID.624.)  Plaintiff testified that she continued to try to do her job but was having difficulty doing so.  A union steward and

union safety representative suggested Plaintiff go home to get her braces so that she could do the job. Plaintiff also testified she overheard Reed telling other management employees that she was going to suspend Plaintiff for thirty days if she required any restrictions. When Plaintiff returned with her braces, she was put "on notice" by Reed, which Plaintiff described as a verbal warning that she could be disciplined if anything else came up within the next twenty-four hours. (ECF No. 23-2, PageID.561.)

The next day Plaintiff was again put on Team 38 and after she informed Reed she could not do the job, she was sent home.[2] (ECF No. 23-10.) According to another statement prepared by Plaintiff, a similar incident took place on March 15, 2018, and Plaintiff again went to the medical department. (ECF Nos. 23-11; 23-12.) She was informed that day by a co-worker that Reed had "put it out there" that she would be fired if she continued to require trips to the medical department. (ECF No. 23-12.) Defendant notes Plaintiff had no restrictions on file during that time. (ECF No. 20-11.)

On March 16, 2018, Plaintiff presented the medical department with a note from an urgent care center stating that she was restricted from lifting more than five pounds for two weeks but that assembly and hand tools were otherwise okay. (ECF No. 23-13.) On March 26, 2018, Plaintiff presented a doctor's note indicating she could do "no gripping, hand tools are okay, nothing over five pounds" for the period from March 26, 2018 through June 26, 2018 due to carpal tunnel syndrome. (ECF No. 23-14.) Plaintiff stayed on the panel secure job after her union came to an agreement with management and Reed. (ECF No. 23-2, PageID.565.)

---

[2] In her deposition, Plaintiff could not recall whether she was sent home that day but included this assertion in a voluntary statement she had prepared for the union.

4

On June 13, 2018, an incident took place during which Plaintiff's drill stopped working and Reed asked her to use a heavier, secondary drill to do the job. (*Id.* at PageID.564; ECF No. 23-15.) Plaintiff states that because she refused to do so, Reed became upset and said she would get her kicked off the team. The normal drill began working again shortly thereafter and production resumed. The following day, Plaintiff avers that she was working when she was told by Reed that she needed to go to the medical department and there would be no job available for her for thirty days. As a result, Plaintiff asked her doctor to remove the no-gripping restriction. Plaintiff's new restrictions provided for limited gripping up to five hours a day, no heavy-duty drills, and no lifting over five pounds. (ECF No. 23-16.) Plaintiff also applied for intermittent FMLA leave related to carpal tunnel syndrome in June 2018, which was approved. (ECF No. 23-17.) But Plaintiff avers that Reed's "harassment" of her continued. As an example of this, Plaintiff states she was falsely accused of damaging a panel and put on notice. (ECF No. 23-18.)

Plaintiff provided Defendant with another doctor's letter in September 2018 with the following restrictions: activity as tolerated, not greater than five pounds, limited hand drills. (ECF No. 23-20.) On September 19, 2018, Plaintiff filed an EEOC charge alleging she was being harassed by her supervisor and that she had submitted a request for a reasonable accommodation due to her disability on June 14, 2018. (ECF No. 23-21.) She stated that she had filed complaints with her union, but the situation had only gotten worse for her. Plaintiff testified that she did not discuss the EEOC charge with Reed but that others, including Arkena Willis from human resources, were aware of it. (ECF No. ECF No. 23-2, PageID.574.)

Plaintiff states she continued to have issues with Reed after filing her EEOC complaint and speaking to Willis.  In another voluntary statement she submitted to her union, she stated that when she informed Reed a new drill was hurting her hand and was outside of her restrictions, Reed put her into that job more often, which led to multiple trips to the medical department.  (ECF Nos. 23-22; 23-11.)  On November 9, 2018, Plaintiff was working in the door tester job when Reed yelled at her to go back to the door panel secure job.  Plaintiff got the operations manager involved and a union grievance for "creating a hostile work environment" was later filed as a result.  (ECF No. 23-23.)

On December 20, 2018, Plaintiff presented restrictions limiting her use of vibratory tools and restricting her from lifting over five pounds.  (ECF No. 20-22.)  In March 2019, Plaintiff provided another doctor's note with the same restrictions.  (ECF No. 23-24.)  Plaintiff continued to have approved intermittent FMLA leave that she used for absences or to leave mid-shift if her hands or wrists were bothering her, although Plaintiff complained in May 2019 that Reed made her wait an excessive amount of time after requesting to "FMLA out."  (ECF No. 23-25.)

In May 2019, Plaintiff submitted a doctor's letter stating that she should be moved to another department where she would not have to use a drill or lift anything heavy. (ECF No. 20-25.)  Plaintiff was initially not moved, so she went to Willis, who stated she had never seen the letter.  (ECF No. 23-2, PageID.582-83.)  Plaintiff was transferred a few weeks later to a position in the Quality department, which accommodated all of her restrictions.  According to the testimony of Shera Capers, Defendant's Labor Relations supervisor, Plaintiff did not hold sufficient seniority to successfully bid on any open positions off the assembly line on a permanent basis, but a temporary need had opened

6

up for workers to support an audit.  (ECF No. 20-33, PageID.459.)  Reed was no longer Plaintiff's supervisor while she was working in Quality.

Plaintiff re-applied for intermittent FMLA leave on July 31, 2019.  Her request was for absences up to three times per week with a duration of up to one to two days per episode and for appointments every two to three months.  (ECF No. 23-28.)  On August 1, 2019, Sedgwick, Defendant's third-party FMLA administrator, sent Plaintiff a letter, informing her that her treating provider had not properly completed the provider certification because it did not identify a duration for the leave.

A corrected FMLA certification was faxed to Sedgwick on August 11, 2019.  The form was a duplicate of the prior certification except that it included a duration through December 28, 2019 and bore the initials "RW" (purportedly for the provider, Dr. Robert Walker) next to the duration entries and next to the new date of "08-10-2019."  (ECF No. 23-29.)  After checking with Dr. Walker, Sedgwick notified Anne Stebbins, the hourly FMLA administrator at Defendant's corporate headquarters, that Dr. Walker denied making the edits to the form or initialing the changes.  (ECF No. 20-34, PageID.466.)  Dr. Walker provided a signed statement to this effect.  (ECF No. 20-28.)

Stebbins relayed this information to JNAP Labor Relations and prepared questions for them to ask Plaintiff.  (ECF No. 20-34, PageID.466.)  When Plaintiff was interviewed by Willis, she denied making the changes to the form but had no explanation for why the doctor would deny making those changes.  (ECF No. 23-31.)  Plaintiff was suspended following this interview.  (ECF No. 23-32.)  Defendant concluded that Plaintiff altered the FMLA certification and subsequently terminated her employment on August 28, 2019 for "providing false and/or misleading information to the company" in violation of the

7

company's standards of conduct. (ECF No. 23-33.) This decision was made by Capers after conferring with Stebbins. (ECF No. 23-27, PageID.689.)

## II. Legal Standard

Summary judgment under Federal Rule of Civil Procedure 56(a) is proper when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." When reviewing the record, "'the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor.'" *United States S.E.C. v. Sierra Brokerage Servs., Inc.*, 712 F.3d 321, 327 (6th Cir. 2013) (quoting *Tysinger v. Police Dep't of Zanesville*, 463 F.3d 569, 572 (6th Cir. 2006)). Furthermore, the "'substantive law will identify which facts are material,' and 'summary judgment will not lie if the dispute about a material fact is genuine, that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Id.* at 327 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The moving party bears the initial burden "of establishing the 'absence of evidence to support the nonmoving party's case.'" *Spurlock v. Whitley*, 79 F. App'x 837, 839 (6th Cir. 2003) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). "Once the moving party has met its burden, the nonmoving party 'must present affirmative evidence on critical issues sufficient to allow a jury to return a verdict in its favor.'" *Id.* at 839 (quoting *Guarino v. Brookfield Twp. Trs.*, 980 F.2d 399, 403 (6th Cir. 1992)).

## III. Discrimination

### A. Relevant Framework

The ADA prohibits an employer from discrimination on the basis of disability. 42 U.S.C. § 12112(a). The PWDCRA has a similar prohibition. Mich. Comp. Laws

8

§ 37.1202. "Claims under the PWDCRA essentially track those under the ADA." *Demyanovich v. Cadon Plating & Coatings, LLC*, 747 F.3d 419, 433 (6th Cir. 2013). Discrimination claims are analyzed under different frameworks depending on whether the plaintiff relies on direct or indirect evidence of discrimination. *See Ferrari v. Ford Motor Co.*, 826 F.3d 885, 891 (6th Cir. 2016). Under the direct evidence test, the plaintiff bears the initial burden of establishing that 1) she is disabled and 2) she is otherwise qualified for the position despite her disability. *Kleiber v. Honda of Am. Mfg.*, 485 F.3d 862, 869 (6th Cir. 2007) (citations omitted). The defendant then bears the burden of proving that a challenged job criterion is essential, and therefore a business necessity, or that a proposed accommodation will impose an undue hardship upon the company. *Id.*

When there is no direct evidence of discrimination, the claims are analyzed under the burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973). *See Ferrari*, 826 F.3d at 892. The plaintiff must first establish a prima facie case of discrimination by showing that (1) she is a member of a protected class, (2) she was subject to an adverse employment decision, (3) she was qualified for the position, and (4) she was replaced by someone outside the protected class or treated differently than a similarly situated employee outside his protected class. *See McDonnell Douglas*, 411 U.S. at 802; *O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 313 (1996). The burden of proof then shifts to the employer to articulate a legitimate, non-discriminatory reason for its actions. *McDonnell Douglas*, 411 U.S. at 802. Once the employer articulates such a reason, the burden of proof returns to the plaintiff to rebut the proffered reason by showing it was a pretext for discrimination. *Id.* at 804. A plaintiff may show pretext by demonstrating that the proffered reason 1) had no basis in fact, 2) did

not actually motivate the adverse action, or 3) was insufficient to warrant the action. *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009). To show pretext, plaintiff must demonstrate both that the proffered legitimate, non-discriminatory reason was false, and that unlawful discrimination was the real reason for the adverse act. *See White v. Telcom Credit Union*, 874 F. Supp. 2d 690, 707 (E.D. Mich. 2012).

Plaintiff does not aver there is direct evidence of discrimination here. Plaintiff argues, however, that the discrimination she experienced goes beyond her termination. More specifically, she states "she was made to work jobs that were outside of her restrictions, she was yelled at, forced to leave the line to go to medical, made to do the jobs of multiple people without additional pay, and sent home without pay on several occasions." (*See* ECF No. 23, PageID.531.) But some of these allegedly adverse acts, such as being "yelled at" or sent to the medical department, do not constitute "materially adverse change[s] in the terms and conditions of employment" sufficient to form the basis of a discrimination claim. *See Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 594 (6th Cir. 2007) (adverse acts "must be more disruptive than a mere inconvenience or an alteration of job responsibilities") (internal quotation marks and citation omitted). And to the extent Plaintiff's discrimination claims relate to Defendant's alleged failure to provide reasonable accommodations, those claims inherently rely on direct evidence and will be discussed separately below. *See Blanchet v. Charter Communs., LLC*, No. 21-5073, _ F.4th_, 2022 U.S. App. LEXIS 5990, at *7 (6th Cir. Mar. 8, 2022). This leaves the discrimination claims based on Plaintiff's termination to be analyzed under the *McDonnell Douglas* burden-shifting framework, which the Court will address first.

10

### B. Termination

Defendant argues that even if Plaintiff could establish a prima facie case of discrimination,[3] it has articulated a legitimate, non-discriminatory reason for her termination—that she submitted false information on a medical form in violation of Defendant's written standards of conduct. Plaintiff argues this reason was a pretext for discrimination and that she did not alter any information on the form. But under the honest belief rule, "to establish pretext, 'the plaintiff must allege more than a dispute over the facts upon which [her] discharge was based. [She] must put forth evidence which demonstrates that the employer did not honestly believe in the proffered non-discriminatory reason for its adverse employment action.'" *Tillman v. Ohio Bell Tel. Co.*, 545 F. App'x 340, 349 (6th Cir. 2013) (quoting *Braithwaite v. Timken Co.*, 258 F.3d 488, 493-94 (6th Cir. 2001)). To determine whether the employer had an honest belief in the proffered basis for termination, courts look at whether it "has established a reasonable reliance on the particularized facts that were before it at the time the decision was made." *Id.* at 349 (citations omitted). Plaintiff takes issue with Defendant's investigation, noting it made its decision based on the physician's statement that he did not make the changes to the form and did not inquire into where the fax originated from. But courts "do not require that the decisional process used by the employer 'be optimal or that it left no stone unturned.'" *See id.* at 349 (quoting *Seeger v. Cincinnati Bell Tell Col.*, 681 F.3d 274, 285 (6th Cir. 2012)). "'Rather, the key inquiry is whether the employer made a reasonably

---

[3] Defendant argues in its motion that Plaintiff is not disabled under the ADA and PWDCRA and that she was not qualified for her job but does not press those arguments in its reply. In light of the Court's remaining findings, the Court need not reach these issues.

11

informed and considered decision before taking an adverse employment action.'" *Id.* Here, the record supports Defendant's assertion that Plaintiff was terminated following an investigation that led Defendant to conclude Plaintiff had submitted an altered FMLA certification. That investigation took place at the corporate headquarters and was triggered by Sedgwick. Reed, who Plaintiff alleges subjected her to discrimination, was not involved in the investigation and was no longer Plaintiff's supervisor at the time. In sum, Plaintiff has not shown there is a genuine issue of fact regarding pretext. Defendant is therefore entitled to summary judgment on Plaintiff's discrimination claims stemming from her termination.

### C. Failure to Accommodate

Plaintiff alleges Defendant failed to provide her with reasonable accommodations by having her do jobs outside of her restrictions and sending her home when there was no work available within her restrictions. But it is the employee who bears the burden of proposing reasonable accommodations. *See Johnson v. Cleveland City Sch. Dist.*, 443 F. App'x 974, 983 (6th Cir. 2011). Reasonable accommodations do not require employers to eliminate essential functions, create new jobs, displace existing employees, or violate other employees' rights under a collective bargaining agreement. *Thompson v. E.I. DuPont deNemours & Co.*, 70 F. App'x 332, 336 (6th Cir. 2003).

Plaintiff relies on *Hendricks-Robinson v. Excel Corp.*, 154 F.3d 685, 694 (7th Cir. 1998), to argue that "[a] request as straightforward as asking for continued employment is a sufficient request for accommodation." In that case, however, permanently restricted employees were placed on medical layoff and then terminated despite seeking to continue working in their original jobs or in some other capacity. *See id.* at 687. Here,

12

Plaintiff was eventually placed in a position that met all of her restrictions and she has not shown that she was terminated as a result of her disability. Moreover, the Sixth Circuit has recognized that "a medical leave of absence can constitute a reasonable accommodation under appropriate circumstances." *See Walsh v. United States Parcel Serv.*, 201 F.3d 718, 726 (6th Cir. 2000). Plaintiff herself acknowledges that when she had restrictions of no gripping, no lifting over five pounds, and no use of vibratory tools in 2018, there were no assembly jobs that she could perform on Team 41 or Team 38. (ECF No. 23-2, PageID.562-63.) And while she may have desired a job off the assembly line, she did not have enough seniority to be transferred to such a job on a permanent basis under the collective bargaining agreement in effect. (ECF No. 20-33, PageID.459.) In sum, there is no genuine question of fact regarding whether Defendant failed to provide Plaintiff with a reasonable accommodation she requested. Thus, Defendant is entitled to summary judgment on the failure to accommodate claims.

## IV.   Retaliation

### A.   Relevant Framework

Under the ADA's retaliation provision, it is unlawful for an employer to discriminate against any of its employees because that employee "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this Act." 42 U.S.C. § 12203(a). The PWDCRA contains a similar provision. *See* Mich. Comp. Laws § 37.1602(a). In order to establish retaliation under the ADA and PWDCRA, Plaintiff must prove that 1) she engaged in protected activity, 2) Defendant knew she engaged in protected activity, 3) an adverse employment action was subsequently taken against her, and 4) there was a causal connection between the protected activity and the adverse

employment action. *See Penny v. United Parcel Serv.*, 128 F.3d 408, 417 (6th Cir. 1997) (ADA); *Bachman v. Swan Harbour Ass'n*, 653 N.W.2d 415, 437 (Mich. Ct. App. 2002) (PWDCRA). When there is no direct evidence of retaliation, a plaintiff's claim is analyzed under the burden-shifting framework articulated in *McDonnell Douglas Corp.*, 411 U.S. at 802-04, which is described above.

**B.     Analysis**

Plaintiff states she engaged in protected activity by complaining verbally to human resources and submitting written statements, grievances, and an EEOC complaint. Defendant argues that Plaintiff cannot establish a prima facie case of retaliation because there is no evidence that any protected activity was causally connected to her termination.

As a threshold matter, there is no evidence the individuals who conducted the investigation, the Sedgwick representative and Stebbins, and the person who ultimately made the termination decision, Capers, were even aware of most of the protected activity.[4] *See Pawlaczyk v. Besser Credit Union*, No. 1:14-CV-10983, 2015 U.S. Dist. LEXIS 90591, at *35 (E.D. Mich. Apr. 13, 2015) ("if the decision-makers did not know of the protected activity, it did not cause them to take an adverse action"). Moreover, "[w]here some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality." *See Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008). Here, Plaintiff made her

---

[4] Stebbins was aware of the complaint regarding Reed not allowing Plaintiff to "FMLA out" fast enough. (ECF No. 23-25.) But she testified that she did not receive any written complaints from Plaintiff, (ECF No. 23-26, PageID.682), and Capers testified that she was not aware that Plaintiff had filed an EEOC complaint, (ECF No. 20-33, PageID.456).

complaints in 2018 and filed her EEOC complaint in September 2018, but she was not terminated until August 2019. And there is no additional evidence that could give rise to an inference that Plaintiff's termination was retaliatory.[5]

And even if Plaintiff could establish a prima facie case of retaliation, Defendant has articulated a legitimate non-retaliatory reason for Plaintiff's termination—that she submitted false information on a medical form—and Plaintiff has not shown that this reason was a pretext for retaliation, as discussed above. *See Tingle v. Arbors at Hilliard*, 692 F.3d 523, 530 (6th Cir. 2012) ("[A] case alleging unlawful retaliation is not a vehicle for litigating the accuracy of the employer's grounds for termination."). Therefore, Defendant is entitled to summary judgment on Plaintiff's retaliation claims.

## V. Conclusion

For the foregoing reasons, Defendant's motion for summary judgment is GRANTED.

SO ORDERED.

                                        s/Nancy G. Edmunds
                                        Nancy G. Edmunds
                                        United States District Judge

Dated: March 29, 2022

I hereby certify that a copy of the foregoing document was served upon counsel of record on March 29, 2022, by electronic and/or ordinary mail.

                                        s/Lisa Bartlett
                                        Case Manager

---

[5] To the extent Plaintiff relies on Reed's other allegedly adverse acts as the basis for her claims, Plaintiff similarly has not pointed to any evidence that would establish causation.